UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
MIKHAIL NISANOV and MARGARITA
NISANOV,

                Plaintiffs,

    -against-

BLACK & DECKER (U.S.) INC.,

                Defendant.
-------------------------------------------------------------- X

**MEMORANDUM**
**DECISION AND ORDER**

05 Civ. 5911 (BMC)

**COGAN**, District Judge.

This is a diversity products liability suit brought by the plaintiffs, an injured husband (Mikhail Nisanov) and his wife, against the defendant manufacturer and designer of an electric lawnmower, Black & Decker ("B&D"). Plaintiffs assert claims for negligent design and manufacture; strict liability defective design and manufacture; and breach of warranty. Presently before the Court is defendant's motion in limine to exclude the testimony of two experts that plaintiffs have designated. The parties have consented to this Court's ruling based on the affidavits, briefs, depositions of the experts, and oral arguments without the need for an evidentiary hearing. For the reasons set forth below, the motion is granted.

## BACKGROUND

The accident involved in this case occurred on September 21, 2003, and resulted in the amputation of Mr. Nisanov's left second, third, and fourth fingers, and part of his left pinkie. Nisanov had purchased the lawnmower – a walk-behind, electric mower manufactured in 14th or 19th week of 1979 – from a neighbor in the spring of 2003. Mr. Nisanov is an immigrant from

Uzbekistan and had not used a lawnmower prior to the mower in question. He is not fluent in English.

On the date of the accident, after mowing the grass in his front yard, Nisanov turned the lawnmower off using the "rocker" switch, i.e., the on-off switch, on the mower handle, and turned the mower upside down on his lawn to clear grass clippings from the blade area under the mower. He did not unplug the mower before doing so. As he cleared the grass with his left hand, the mower moved slightly, and the rocker switch turned to the "on" position and the blade started, resulting in the severing of his fingers. It is unclear what impacted the switch when the mower was upside down; Nisanov testified that there were sticks in the area and perhaps one of them impacted it.

Plaintiffs rely heavily on the fact that in 1974, the United States Consumer Products Safety Commission ("CPSC") preliminarily determined that the hazards associated with lawnmowers presented unreasonable risks of injury and called for a proceeding to develop a consumer product safety standard. This was based, in part, on data collected by the National Electronic Injury Surveillance System concerning lawnmower injuries. After a period of debate and testing, the CPSC issued, among other things, a proposed rule for walk-behind mowers, which incorporated the use of a "deadman's switch," i.e., a switch with which the operator would have to keep continuous contact for the motor and blade to operate. This type of switch is known as an "interlock," a device or arrangement that will prevent an undesired operation. The proposed rule also mandated a second control to be manually actuated before a stopped blade could be restarted as a further measure to prevent unintended actuation. The proposed rule also provided for a multicolored warning label to be placed on the lawnmower's housing which included a symbol of a hand with a circle around it and a line running through the hand on a

yellow background and the words "KEEP HANDS and FEET AWAY" and "DANGER" prominently displayed against a yellow background.

In February 1979, the CSPC exercised its rule making power and issued its final standard for walk behind lawnmowers, which included the use of a deadman's switch and a warning label similar to that in the proposed rule. The label requirement did not become effective until December 31, 1979 and the deadman's switch did not become effective until December 31, 1981. B&D chose not to incorporate such an on-off control system or warning label on the subject lawnmower.

Plaintiffs offer Mr. Harry Ehrlich as an engineering expert and Dr. Michael Wogalter as a human factors expert. Ehrlich intends to testify that the design of the lawnmower was defective and caused the accident because the rocker switch rose too far above its casing and did not include a deadman's switch, allowing it to be accidentally switched on, and that, therefore, the lawnmower should have been recalled. In response to questioning by B&D at his deposition, Ehrlich also testified that the warning on the lawnmower was insufficient. Wogalter intends to testify concerning what he contends are the improper design and inadequate warning, but from a human factors perspective.

B&D moves, pursuant to Fed. R. Evid. 702, to exclude the testimony of both of Plaintiffs' experts.

## DISCUSSION

### I. Controlling Principles

Expert testimony must be evaluated in accordance with Fed. R. Evid. 702, which states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon

sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 imposes a two-fold analysis on the trial court. First, the court must determine whether the proposed witness is qualified as an expert. Fed. R. Evid. 702; Baker v. Urban Outfitters, Inc., 254 F.Supp.2d 346, 352 (S.D.N.Y. 2003). If the court is satisfied that the proposed witness does indeed qualify as an expert, then the court must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrill Dow Pharm., Inc., 509 U.S. 579, 597, 113 S.Ct. 2786, 2799 (1993). The burden of establishing the admissibility of the proffered expert testimony weighs on the proponent of that testimony. See Humphrey v. Diamant Boart, Inc., No. 06 Civ. 2771, 2008 WL 413801 (E.D.N.Y. Feb. 13, 2008) (collecting authority). "Though the weight given to expert testimony should be left to the finder of fact, expert testimony should be excluded altogether if it is 'speculative' or 'conjectural' or if it is based on assumptions 'so unrealistic and contradictory as to suggest bad faith.'" Baker, 254 F.Supp.2d at 353 (quoting Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996)). Moreover, courts are not required to admit expert opinion evidence that is "connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." General Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 519 (1997).

The qualification of experts falls within the broad discretion of the trial court, see Stagl v. Delta Air Lines, Inc., 117 F.3d 76 (2d Cir. 1997), which need not preclude an expert from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute. See, e.g., id. (reversing trial court's preclusion order despite the fact that the expert had no experience designing the specific kind of system at issue); McCullock v. H.B. Fuller Co., 61 F.3d 1038 (2d Cir. 1995) (holding that district court

properly admitted expert testimony of a physician whose specialty area was not identical to the subject matter of the dispute); Yaccarino v. Motor Coach Indus., Inc., No. 03 Civ. 4527, 2006 WL 5230033 (E.D.N.Y. Sept. 29, 2006) (mechanical engineer qualified to testify as an expert concerning the inadequacy of a slide track steel assembly for a bus driver's seat despite not being trained in metallurgy and not having experience evaluating seating systems designed for motor vehicles, because he did have experience with similar mechanical slide assemblies); Kass v. West Bend Co., No. 02 Civ. 3719, 2004 WL 2475606 (E.D.N.Y. Nov. 4, 2004) (holding, in a case involving an allegedly defective coffee maker, that an expert was qualified, where, despite having no experience with consumer products, he had sufficient experience in accident prevention); Lappe v. Am. Honda Motor Co., Inc., 857 F.Supp. 222, 226 (N.D.N.Y. 1994) ("[i]n a product liability action, an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization affects the weight of the opinion, not its admissibility") (citation omitted).

However, the expert must have relevant experience and qualifications such that whatever opinion he or she will ultimately express would not necessarily be speculative. See Quintilla v. Komori Am. Corp, No. 04 Civ. 5227, 2007 WL 1309539 (E.D.N.Y. May 4, 2007) (engineer with no experience with printing presses *or* with design of machine guarding, but with experience in mechanical design for the electronics industry was not qualified to testify as expert on design of printing presses concerning lack of safety interlocks or hand guards); Barban v. Rheem Textile Sys., Inc., No. 01 Civ. 8475, 2005 WL 387660 (E.D.N.Y. Feb. 11, 2005) (engineer who had never designed a machine of any kind *and* had no experience in the dry cleaning business was not qualified to testify that the design of a dry cleaning machine was inherently dangerous); Baker, 254 F.Supp.2d 346 (while expert was a professional photographer, his experience was

limited to commission work and was therefore not qualified to be an expert regarding stock photography, about which he had almost no experience).

Once the court is satisfied that a proposed witness does qualify as an expert, then the court must determine whether scientific or technical testimony provided by that expert is both relevant and reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167 (1999); Daubert, 509 U.S. 579, 113 S.Ct. 2786. In pertinent part, Fed. R. Evid. 702 states that a qualified expert may testify "in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

The Second Circuit has described the general methodology to be employed by trial courts in conducting Rule 702 analyses. See Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256 (2d Cir. 2002). First, the trial court should determine "whether proffered expert testimony is relevant, i.e., whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Id. at 265 (internal quotations omitted). Next, the court should determine "whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered." Id. (internal quotation, citation omitted). The trial court possesses "broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case." Id.

But these criteria are not exhaustive. See Wills v. Amerada Hess Corp., 379 F.3d 32 (2d Cir. 2004). Daubert enumerated a list of additional factors bearing on reliability that district courts may, but are not required to, consider: (1) whether a theory or technique has been or can be tested; (2) "whether the theory or technique has been subjected to peer review and

publication;" (3) the technique's "known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation;" and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. See Daubert, 509 U.S. at 593-94, 113 S.Ct. at 2796-97.

However, "Daubert 's list of specific factors neither necessarily nor exclusively applies to all experts or in every case." Kumho Tire, 526 U.S. at 141, 119 S.Ct. at 1171. Rather, the district court's inquiry into the reliability of expert testimony under Rule 702 is a "flexible one." Daubert, 509 U.S. at 594, 113 S.Ct. at 2797. Accordingly, "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." Kumho Tire, 526 U.S. at 142, 119 S.Ct. at 1171.

## II. Ehrlich

The main thrust of Ehrlich's proposed testimony is that the lawnmower was not properly designed because its rocker switch was too susceptible to inadvertent actuation and it lacked a deadman's switch to avoid the same. B&D's initial argument is that Ehrlich does not have experience in the lawnmower industry, and does not have sufficient experience in rocker switches or interlocks to make up for his lack of lawnmower specific experience. Although Ehrlich admittedly has no experience in the lawnmower industry, he does claim to have extensive experience with devices intended to avoid inadvertent actuation of machinery (both interlocks and on-off switches). B&D complains that the experience Ehrlich cites is with industrial rather than consumer products.

B&D also argues that Ehrlich has not designed any switches, and in his own deposition Ehrlich said that he could not recall doing so. Ehrlich now recalls, in his affidavit submitted in support of plaintiffs' opposition to this motion, that he designed a switch for use on electric

heating pads, but he argues that in any event what is relevant here is not the internal workings of the switch, but how it is incorporated in the molding around it and the safety factors associated with that, and his experience lies there (according to his affidavit).

I find that Ehrlich is qualified to offer his opinion as an expert concerning the switches and interlocks that were or could have been used in the lawnmower in question.

First, with regard to interlocks, Ehrlich "spent a significant portion of [his] time in the design, specification, implementation and enforcement of machine guards." He specifically references work on "guards that protect people from hazards associated with inadvertent actuation," which seems close to the issue here. He also refers to "experience with operator presence sensing devices, including but not limited to, interlocked doors for robotic sonic welders, interlocked gates for injection molding machines, interlocked gates for extrusion blow molding machines, presence-sensing limit switches for radio-frequency sealing machines, presence-sensing optical switch (light curtain) for a high-speed labeler, two-hand tip controls for foil printing machines, two-hand trip controls for die-cutting machines, two-hand trip controls for heat staking machines, two-hand trip controls for carton gluing machines, interlocks for corrugated baler machines, and limit switches for various turntable assembly machines."

With regard to switches, Ehrlich has "experience with recessed controls, to protect against inadvertent actuation, with machine such as conveyers, air cylinder pressures, hydraulic presses, and all the aforementioned two-hand control devices." He has also "specified and implemented protective covers for foot pedals to prevent inadvertent actuation of machinery."

Ehrlich's CV indicates that since receiving his B.S. in engineering in 1978 he has worked for companies in the following fields: aircraft engine manufacturer; leather goods manufacturer; high volume toy manufacturer; plastic appliances, jewelry, and cosmetics; heath care appliances

manufacturer; appliance and cookware manufacturer; and consulting. According to his CV and affidavit, Ehrlich has spent over 25 years in industrial engineering and at every stop his responsibilities have included what he describes as product design, product development, and/or manufacturing, among other duties.

B&D's argument that Ehrlich's experience is with industrial rather than consumer products is insufficient to render him unqualified. Once it is recognized that an expert need not have experience with the particular product at issue, as the cases cited above demonstrate, it follows that the consideration of the environmental factors that render the expert's experience useful or not useful more properly goes to weight, not admissibility. The important point is that the mechanism at issue has sufficient similarities to those with which the expert has experience so that the expert's experience is relevant.

B&D also argues that Ehrlich is not qualified to say that there should have been a recall as a result of the design because he has no experience in recalls. However, Ehrlich does have experience with recalls. Specifically, his affidavit states that he has "worked with the Staten Island office of CPSC with regard to hazard analysis [to determine if a product should be recalled] for infant cribs," and has "also done work in the area of recalls for plastic lawn chairs, votive candles, decorative candles in glass containers, an oven cleaner, a portable inflation device/compressor, and the AB Lounge exercise machine to name a few." Thus Ehrlich is qualified to opine on whether a recall is necessary, assuming there is such a requirement.[1]

With regard to the substance of his opinions, B&D argues that Ehrlich's opinions that the accident resulted from the design of the rocker switch and failure to include a deadman's switch,

---

[1] I agree with defendant's point that Ehrlich has no qualifications to testify to warnings, but it does not appear that plaintiff is proffering him on that point.

are unreliable. B&D makes two arguments in support of this result, and although the first fails, the second succeeds.

First, B&D argues that Ehrlich's recreation of the accident and test of the current mower design is not reliable. B&D points out that at his deposition, Ehrlich couldn't even remember whether he recreated the accident two or three times. Furthermore, Ehrlich's testimony – that plaintiff supplied a stick to replicate one that might have caused the lawnmower to actuate and that plaintiff described the orientation of the stick in relation to the mower switch – was contradictory to Nisanov's deposition testimony.

I find that Ehrlich's recreation of the accident and test of the current mower design is not so removed from the description of the accident as to preclude his opinion. The accident could not be precisely replicated for a number of reasons, including that plaintiff is not certain what the object was that caused the actuation, but Ehrlich undertook reasonable efforts to understand what occurred in forming his opinions. Ehrlich interviewed Nisanov as to the location and details of how the accident happened and then replicated the happening of the accident using the lawnmower involved at the location where it occurred in plaintiffs' front yard. Nisanov believes a branch may have triggered the rocker switch, so Ehrlich and Nisanov chose a similar branch. Ehrlich ran three "tests" in which he replicated Nisanov's hand movement of clearing grass from the blade area, which in turn caused the lawnmower to move slightly, and in each case the rocker switch became fully engaged to its "on" position. B&D complains that Ehrlich did not have the lawnmower plugged in when testing it, but for obvious reasons this would have been a bad idea, and B&D does not explain why this was necessary, i.e., how it would have affected the switch turning on or not.

Second, B&D argues that Ehrlich's opinions concerning alternative design are not reliable. For expert testimony on design defect to be relevant, not only "must it offer feasible alternative design, but the expert must also establish that his hypothetical design would have resulted in greater safety *in the . . . accident at issue*." Zaremba, v. Gen. Motors Corp., 360 F.3d 355, 359 (2d Cir. 2004) (emphasis added). It is in the emphasized language that Ehrlich's opinion fails.

In Zaremba, the plaintiffs alleged that when the Trans Am in which they were riding flipped over, they were injured to the degree they were because of a design defect in the Trans Am's T-top. Plaintiffs argued that, although their proposed expert, Phillips, did not perform any test on his alternative design, he was entitled to rely on tests that GM itself had performed on a vehicle similar to Phillips's (alternate) design. The Circuit sustained the exclusion of the expert's testimony, stating that:

> The GM Memo [on the alternative design] does not, however, show that a modified T-top - even if stiffer than the Trans Am involved in the accident - is thereby less likely to lose its T-tops and side and rear windows in a crash. Even accepting that the GM Memo involved a modified T-top similar to the design advanced by Phillips, and that GM's tests demonstrated that the modifications improved the car's torsional and bending performance, Phillips offers no tests, models, calculations, or drawings to show that the improved performance would prevent the T-tops and windows from giving way in the high-speed accident in this case. It is not enough for Phillips to testify reliably that his hypothetical alternative design would, in some respects, have better performance than the Trans Am involved in the accident; to provide relevant testimony, Phillips must also establish that his hypothetical design would have resulted in greater safety in the rollover accident at issue. Though he is apparently willing to testify to this, Daubert and Rule 702 require that this testimony be reliable. In the absence of drawings, models, calculations, or tests, it was not manifest error for the District Court to find that Phillips's testimony was insufficiently reliable.

Id.

Ehrlich's opinions concerning the alternate design are not reliable. Ehrlich did not build or test prototypes with a recessed rocker switch or deadman's switch. Instead, he took

measurements of defendant's rocker switch, did some limited calculations and deduced that a more recessed switch would not be so exposed and would not be subject to accidental activation. Ehrlich explains that the switch pictured in a 1964 Grainger industrial supply catalog, which he points to as an alternative, was no longer available to test when he was retained and that is why he used the calculations instead. However, the switch pictured in the 1964 Grainger catalog did not include measurements, so Ehrlich did not even have measurements of the alternate switch design. Although it may be self evident that a more fully recessed switch would be less easily actuated by accident, we do not know whether such a switch would have turned on during the replicated accident (putting aside the difficulties in replicating the accident), because it was not built and tested.

Ehrlich offers no calculations to show that the alternative designs would have prevented the accidental actuation of the lawnmower under the range of circumstances that might have converged to cause Nisanov's injury. Although plaintiffs note that the CPSC tested and peer reviewed the deadman control and switch standard and concluded that its implementation would create a safer product, this is just like the plaintiffs' efforts in Zaremba to rely GM's testing, an argument the Second Circuit rejected.

As plaintiffs here acknowledged at oral argument, "the [CPSC] . . . had developed a design, which would have avoided 77,000 plus amputations a year *or some portion thereof.*" (Emphasis added). But nothing in the report nor in the expert's testing allows him to opine that Nisanov would have been in the "some portion thereof" that avoided accidents as opposed to the group that did not. Neither plaintiffs nor Ehrlich point to anything in the CPSC report which even addresses whether it would have resulted in greater safety "in the accident at issue."

## III. Wogalter

Wogalter intends to testify that, from a "human factors" perspective (1) the warning on the lawnmower was inadequate and (2) the rocker switch and safeguards were improperly designed. B&D argues that Wogalter is not qualified to render opinions on these topics because: he is not an engineer; he has no experience of any kind in the lawnmower industry; he has not published any articles addressing electrically powered lawnmowers; he has never designed an switch; he has never consulted on matters involving lawnmowers or switches; and he has never worked for a manufacturer. In sum, he has insufficient engineering, design, and manufacturing experience, and has no experience with lawnmowers in particular.

However, B&D ignores the fact that Wogalter intends to testify as a human factors expert. B&D offers no legal authority concerning the exclusion of human factors experts and Wogalter does appear to be well qualified in that field. Even though he does not have experience with lawnmowers and is not an engineer, Wogalter has sufficient experience and qualifications in product safety and warnings from a human factors perspective to offer expert testimony on the interactions and responses of people with the switches and warnings at issue. Wogalter holds a doctorate in Human Factors Psychology. He has taught at the University of Richmond, Rensselaer Polytechnic Institute, and now North Carolina State "numerous undergraduate and graduate classes including human factors in design, warnings and risk communication, human factors of safety." He has published extensively in peer-reviewed publications in human factors and warnings. His publications have included discussions regarding the hazard control hierarchy, which prioritizes the basic strategies of safety, i.e., design out, following by guarding, and then by warning. Finally, according to his affidavit, Wogalter has "testified on three-way

switches on shredders, automobile accelerators, and other complex controls," and "has been lecturing about methods of inadvertent actuation of controls for nearly two decades."

Despite his qualifications, I find that Wogalter's opinions concerning the design of the lawnmower's rocker switch and lack of a deadman's switch should be excluded for the same reasons that Ehrlich's opinions were and because of additional flaws unique to his opinion.

Wogalter relies on Ehrlich's opinion for measurements, fact gathering, and testing of the original switch. He has not himself inspected the lawnmower or switch or interviewed Nisanov about what happened. Wogalter did no testing on the difference in likelihood of inadvertent actuation of the switch on the mower or of the alternate designs. Thus, the problem with Wogalter testifying to his opinions on the switch design and lack of interlock is that he did not use any expertise or identifiable methodology to reach it. He has cited no empirical studies that are sufficiently specific to the facts at hand to be helpful. His generalized opinions, for example, that a person might turn over a lawnmower like this one and clean out the blades without unplugging the mower because they were distracted or forgetful, are little more than common sense. His application of those theories to this case seems more impressionistic, subjective and conclusory than scientific.

Similarly, Wogalter's opinions concerning the mower's warning should be excluded because he offers no scientific analysis of the benefits of alternate warnings. It is not enough here to point out the importance of warnings because the lawnmower in question had a warning. The question is whether an alternate warning would have prevented this accident. On that question, Wogalter does not offer enough to make his testimony reliable, and therefore it must be excluded. Wogalter's analysis about the warnings is focused on the significance of a warning rather than the significance of an alternate warning. To the extent Dr. Wogalter does address

alternate warnings, he does so in a manner so devoid of any scientific method that I find it unreliable under a Daubert analysis.

## CONCLUSION

Defendant's motion is granted. Since defendant indicated at oral argument that in the absence of expert testimony, it would seek summary judgment, it shall file its motion within ten days of entry of this Order on the docket.

**SO ORDERED.**

s/Hon. Brian M. Cogan
_____
U.S.D.J.

Dated: Brooklyn, New York
April 2, 2008